# In the United States Court of Federal Claims

Nos. 21-1030C, 21-1041C, 21-1043C & 21-1053C
Originally Filed: March 29, 2021
Re-issued: April 14, 2021[1]

| | |
|---|---|
| SIRIUS FEDERAL, LLC<br>(f/k/a FORCE 3, LLC),<br>CDW GOVERNMENT LLC,<br>COUNTERTRADE PRODUCTS, INC., and<br>BLUE TECH INC.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNITED STATES,<br><br>*Defendant,*<br><br>and<br><br>TELOS CORPORATION, and<br>RED RIVER TECHNOLOGY LLC,<br><br>*Defendant-Intervenors*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

*David A. Edelstein*, Asmar, Schor & McKenna, PLLC, Washington, D.C., for Plaintiff Sirius Federal, LLC (f/k/a FORCE 3, LLC). *Laurence Schor*, of counsel.

*David Y. Yang*, K&L Gates LLP, Seattle, WA, for Plaintiff CDW Government LLC. *Stuart B. Nibley, Erica L. Bakies, Sarah F. Burgart,* and *Melody A. Alemansour*, of counsel.

*Scott F. Lane*, Thompson Coburn LLP, St. Louis, MO, for Plaintiff CounterTrade Products, Inc. *Katherine S. Nucci* and *Jayna Marie Rust*, of counsel.

*Paul F. Khoury*, Wiley Rein LLP, Washington, D.C., for Plaintiff Blue Tech Inc. *Brian G. Walsh, Cara L. Lasley, Sarah B. Hansen,* and *Adam R. Briscoe*, of counsel.

---

[1] The Court initially filed this opinion under seal so that the Parties could propose redactions. The redactions are indicated by bracketed ellipses ("[ … ]") below.

*Reta E. Bezak*, Trial Attorney, United States Department of Justice, Civil Division, Washington, D.C., with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Patricia M. McCarthy*, Assistant Director, *Catharine Parnell* and *Bret Vallacher*, Trial Attorneys, and *Jaron E. Chriss*, General Services Administration, Office of the General Counsel, Southeast Sunbelt Division, Senior Assistant Regional Counsel, of counsel.

*C. Peter Dungan*, Miles & Stockbridge P.C., Washington, D.C., for Defendant-Intervenor Telos Corporation. *Roger V. Abbott* and *Jarrod R. Carman*, of counsel.

*Gregory R. Hallmark*, Holland & Knight LLP, Tysons, VA, for Defendant-Intervenor Red River Technology LLC. *Amy L. Fuentes* and *Kelsey M. Hayes*, of counsel.

## OPINION AND ORDER

**MEYERS, Judge**.

Pending before the Court in this multi-party consolidated protest are two motions for preliminary injunctive relief and two motions to dismiss three of the Plaintiffs. The motions for preliminary injunctive relief seek to prohibit the Government from issuing any orders against the disputed Blanket Purchase Agreements while this action is pending. The motions to dismiss, filed by the Defendant-Intervenors but not the Government, allege that three of the Plaintiffs lack standing. For the reasons explained below, the pending motions are each denied.

## I.   Factual Background

### A.   The Solicitation.

On March 4, 2019, the United States, acting through the General Services Administration, Federal Acquisition Service, Information Technology Category ("GSA" or the "Government" or the "Agency") issued RFQ No. 47QTCA-19-Q-0009 (the "RFQ") for the "2nd Generation Information Technology Blanket Purchase Agreement" program ("2GIT"). Sirius Federal Compl. ¶¶ 1, 10; CDW-G Compl. ¶¶ 1, 10; CounterTrade Compl. ¶¶ 1, 13; Blue Tech Compl. ¶¶ 1, 29. The RFQ contemplated the award of multiple firm-fixed-price BPAs under FAR 8.405-3(b) with a five-year period of performance. RFQ § 4, D. Appx at 142; RFQ § 6, D. Appx at 152. Under this procurement, GSA sought multiple award BPAs for IT "hardware and software commodities, ancillary supplies and services as a follow on to the First Generation Information Technology (1GIT) BPAs." *See* RFQ § 2.1, D. Appx at 141. The RFQ anticipated nine BPA awards, but GSA reserved the right to make additional awards at its discretion. RFQ § 15.1, D. Appx at 187-88.

The 2GIT BPAs "will contain attributes not found in other IT commodity acquisitions solutions within the Federal Government" and will "decrease costs, reduce paperwork and save time by eliminating the need for repetitive, individual purchases from the GSA Schedule contract." RFQ § 2.2, D. Appx at 142. 2GIT also incorporates security and supply chain risk management procedures. *See* RFQ § 5, D. Appx at 145-46. Based upon these attributes, the United States Air Force "has decided to make the 2GIT BPA a mandatory use vehicle for the

replacement of the NETCENTS-2 Products IDIQ contract," which expired in 2019.  RFQ § 2.2, D. Appx at 142; *see also* CDW-G Compl. at 1.

The 2GIT RFQ describes the basis for awards as a tradeoff of non-price factors and price. RFQ § 15.1, D. Appx at 187.  The RFQ states that "[t]he Government will consider all non-price and price factors in addition to a comparative consideration of price, special features, [and] administrative costs to meet the Government's needs . . . . All evaluation factors other than cost or price, when combined, are significantly more important the cost or price." *Id.*  The solicitation also notes that a goal of the multiple award BPAs is to provide a broad network of original equipment manufacturers ("OEMs").  RFQ § 15.1, D. Appx at 187-88.  The RFQ notes that GSA may adjust the number of awardees in furtherance of the goal of broad OEM coverage. RFQ § 15.1, D. Appx at 188.

The RFQ identifies four non-price factors: (1) breadth of OEMs ("BOEM"); (2) relevant experience; (3) socioeconomic considerations; and (4) supply chain risk management ("SCRM"). RFQ "Non-Price Factors", D. Appx at 189.  Quotes largely consist of self-scoring assessments for each factor.  The RFQ cautions that exaggerated self-scoring assessments could result in the quoter's elimination from further consideration.  RFQ "Non Price Factors (e)", D. Appx at189.

The price factor consists of a market basket evaluation in which quoters provide a quote for each product in a market basket compiled by GSA.  RFQ § 15.2.1, D. Appx at 190.  The RFQ warns that "[q]uoters must quote on each item in the market basket" and that "[q]uoters must quote products that meet or exceed the minimum salient characteristics specified for each item listed in the market basket." *Id.*  The RFQ also requires quoters to "submit documentation to support their claim that each product they quoted meets the minimum salient characteristics specified." *Id.*  The required supporting documentation included submission of specification sheets on each OEM—that is, technical data sheets or product brochures that summarize "the performance and other characteristics of a product in sufficient detail that allows the evaluation team to understand what the product is and if the item meets or exceeds the Government[']s minimum salient characteristics of the item requested." RFQ § 15.2.1, D. Appx at 191.  If a quoter does not include all items in the market basket or if its quoted items are deemed technically unacceptable, the quoter will be eliminated and ineligible for award unless the deficiency was cured.  RFQ § 15.2.1.1.3, D. Appx at 193.

The RFQ allows for the use of Contractor Teaming Arrangements ("CTAs").  *See* RFQ § 10.10, D. Appx at 155.  CTA Team Members, like their CTA Team Lead counterparts, are required to have IT Schedule 70 contracts.  *Id.*  The RFQ requires CTAs to provide a copy of their CTA agreements along with their quotes but does not otherwise place constraints on the form or format of these agreements.  D. Appx at 156.  In the event a CTA is chosen for award, the RFQ expressly addresses that CTA Team Members are not Subcontractors and summarizes the key differences.  *See* RFQ "CTAs versus Prime/Subcontractor Relationships", D. Appx at 159 (stating among other differences that "Each team member has privity of contract with the government and can interact directly with the government.").

### B.    Procurement History.

3

GSA initially made awards under the RFQ in November 2019.  *See* D. Appx 879. Several unsuccessful bidders subsequently filed protests at the Government Accountability Office ("GAO") and, as a result, GSA took corrective action in December 2019.  D. Appx 879. In May 2020, the Agency again issued awards, and again numerous unsuccessful bidders filed GAO protests, resulting in another corrective action. D. Appx 880-81.

On August 10, 2020, GSA issued Amendment 18 to the RFQ which, among other things, changed the basis of award from Highest Rated Quoters with a Fair and Reasonable Price to a best value tradeoff approach.  D. Appx 881; *see also* D. Appx 187.  Quoters were cautioned to closely review the entire revised solicitation document. *See, e.g.*, D. Appx 138, 186, 223 ("Quoters are expected to examine this entire revised BPA solicitation document. Failure to do so will be at the Quoter's own risk.").  Revised quotes were due on August 31, 2020.  D. Appx 136.  On August 18, 2020, the Agency issued Amendment 19 to update the BOEM self-scoring assessment.  D. Appx 256-57.  GSA issued a final amendment, Amendment 20, on August 31, 2020 solely to extend the closing time for quotes an additional hour because of a short period of submission portal inaccessibility.  D. Appx 258.

GSA received 27 quotes in response to the revised solicitation.  The 27 quotes were submitted through CTA submissions—that is, numerous contractors entered into agreements whereby the team members combined their capabilities to meet the procurement requirements. *See* D. Appx155-59 (describing CTAs); *see also* D. Appx 886-87 (identifying the number of team members participating in each quote).  The solicitation did not preclude individual companies from participating in more than one quote, and therefore many companies were members of more than one team.  *See, e.g.*, D. Appx 981-84.  CTA members, unlike subcontractors, would be considered in privity with the Government for the work they were to perform if their teams were chosen for award.  D. Appx 159.  CounterTrade submitted a quote as team lead but was also a member of another team that obtained a BPA award, led by [ … ].  *See* D. Appx 981; *see also* D. Appx 32-42.  Sirius Federal (formerly known as Force 3, LLC) was a member of [ … ] winning teams, D. Appx 982, and Blue Tech was a member of [ … ] winning teams, D. Appx 981.  CDW-G submitted a quote as a team lead but was not a member of any winning team.  D. Appx 886, 981.

GSA also engaged in two rounds of confer sessions with the quoters.  D. Appx 901. Relevant to CounterTrade's Motion for Preliminary Injunction, on November 25, 2020, GSA informed CounterTrade (in its position as team lead), via a Confer Session Notice, that some of its items exceeded the minimum salient characteristics which [ … ].  *See* CounterTrade Compl. ¶¶ 38-39.  The Confer Session Notice also provided CounterTrade the fair opportunity to revise its quote.  *Id.* at ¶ 43.

At the conclusion of the confer sessions, the Agency conducted evaluations of each factor for each quote.  Finally, the contracting team considered the evaluations and engaged in a best value determination analysis that included a comparative evaluation of quoters' non-price and price quote features.  D. Appx 945-77.  GSA ultimately selected nine quoters for award.  D. Appx 975-76.  GSA informed Plaintiffs of the award decision on February 18, 2021.  Sirius Federal Compl. ¶ 37; CDW-G Compl. ¶ 45; CounterTrade Compl. ¶ 46; Blue Tech Compl. ¶ 44.

## II.      Procedural Background.

On March 5, 2021, Sirius Federal, LLC ("Sirius Federal") filed its bid protest with this Court ("Sirius Federal Compl."). ECF No. 1. On March 9, 2021, CDW Government LLC ("CDW-G") filed its related bid protest with this Court ("CDW-G Compl."). Case No. 21-1041, ECF No. 1. On March 10, 2021, CounterTrade Products, Inc. ("CounterTrade") filed its related bid protest with this court ("CounterTrade Compl."). Case No. 21-1043, ECF No. 1. On March 11, 2021, Blue Tech Inc. ("Blue Tech") filed its related bid protest with this Court ("Blue Tech Compl."). Case No. 21-1053, ECF No. 1. These four related bid protests were consolidated with Sirius Federal as the lead case because they concern the same solicitation and contain factual and legal commonalities. ECF No. 12, ECF No. 22, ECF No. 27. On March 9, 2021, CDW-G filed its Motion for Preliminary Injunction and Memorandum in Support ("CDW-G Mot."). Case No. 21-1041, ECF No. 5. On March 12, 2021, CounterTrade filed its Motion for Preliminary Injunction, ECF No. 39, and Memorandum in Support, ECF No. 40 ("CounterTrade Mot."). Neither Sirius Federal nor Blue Tech sought preliminary Injunctive Relief. On March 17, 2021, Defendant-Intervenor Telos Corporation ("Telos") filed a Motion to Dismiss under Rule of the United States Court of Federal Claims ("RCFC") 12(b)(1) for lack of subject matter jurisdiction ("Telos MTD"), ECF No. 52, and Defendant-Intervenor Red River Technology LLC ("Red River") filed a Motion to Dismiss under RCFC 12(b)(1) for lack of subject matter jurisdiction ("Red River MTD"), ECF No. 55. Also on March 17, 2021, the Government filed its Response to CDW-G's and CounterTrade's Preliminary Injunctions ("Def. Resp."), ECF No. 53, and Red River filed its Response to CDW-G's and CounterTrade's Preliminary Injunctions ("Red River Resp."), ECF No. 54. On March 19, 2021, CounterTrade filed its Reply in Support of its Motion for Preliminary Injunction and Response to Defendant-Intervenors' Motions to Dismiss ("CounterTrade Reply" or "CounterTrade Resp."). ECF No. 56. On March 19, 2021, Blue Tech filed its Response to Defendant-Intervenors' Motions to Dismiss ("Blue Tech Resp."), ECF No. 57, and Sirius Federal filed its Response to Defendant-Intervenors' Motions to Dismiss ("Sirius Federal Resp.), ECF No. 58. Lastly, on March 19, 2021, CDW-G filed its Reply in Support of its Motion for Preliminary Injunction ("CDW-G Reply"). ECF No. 59. Oral argument was heard on both the Motions to Dismiss and Motions for Preliminary Injunction on March 22, 2021. These matters are now ripe for review.

## III.      Defendant-Intervenors' Motions to Dismiss.

Given that some, but not all, of the numerous parties are subject to the motions to dismiss, a quick summary about which parties bring or are subject to the pending motions is in order before wading into the various arguments. Defendant-Intervenors Telos, ECF No. 52, and Red River, ECF No. 55, move to dismiss the complaints of Plaintiff Sirius Federal (formerly known as Force 3, LLC), CounterTrade, and Blue Tech for lack of standing under RCFC 12(b)(1). Because many of the arguments are common to multiple parties, the Court will refer to Telos and Red River collectively as "Defendant-Intervenors" and to Sirius, Blue Tech, and CounterTrade collectively as "Plaintiff-Awardees." The motions to dismiss do not challenge Plaintiff CDW-G's standing. The Government does not move to dismiss any Plaintiff's complaint.

### A.      Standard of Review.

Whether this Court has jurisdiction to decide the merits of a case is a threshold matter. *See PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1365 (Fed. Cir. 2007). The burden of proving that the Court of Federal Claims has subject matter jurisdiction over a claim lies with the party seeking to invoke its jurisdiction. *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998). This burden must be established by a preponderance of evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). When deciding a Rule 12(b)(1) Motion to Dismiss, the Court "must accept as true all undisputed facts asserted in the [] complaint and draw all reasonable inferences in favor of the [non-movant]." *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (quoting *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).) Further, the Court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). When making its determination, the Court is allowed to consider not only "the allegations in the complaint, [but] may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'" *A&D Auto Sales, Inc., v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)); *see Terry v. United States*, 103 Fed. Cl. 645, 652 (2012) (collecting cases). If the Court determines that it lacks subject matter jurisdiction, "the court must dismiss the action." RCFC 12(h)(3).

### B.  The challenged Plaintiffs have established their standing.

The question presented is whether the Plaintiff-Awardees, which are members of teams that won BPA awards in this procurement, have standing to pursue their protest actions challenging the Government's rejection of their quotes as team leads. According to Defendant-Intervenors, the Plaintiff-Awardees status as CTA Team Members defeats their standing here. Because "standing is a threshold jurisdictional question," the Court is required to decide this issue before proceeding to the merits. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-04 (1998)).

The Tucker Act gives this Court "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract . . . ." 28 U.S.C. § 1491(b)(1). "The standing issue in this case is framed by 28 U.S.C. § 1491(b)(1), which we have found imposes more stringent standing requirements than Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). Because the Tucker Act does not define "interested party," the Federal Circuit has determined that the proper definition is found in the Competition in Contracting Act ("CICA"). *Am. Fed'n of Gov't Emps., AFL–CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("We therefore construe the term 'interested party' in § 1491(b)(1) in accordance with the CICA."); *see also Eskridge & Assocs. v. United States*, 955 F.3d 1339, 1344 (Fed. Cir. 2020); *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012). Applying the "interested party" definition from the CICA (31 U.S.C. § 3551(2)(A)), the Federal Circuit has limited standing under § 1491(b)(1) to "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Eskridge & Assocs.*, 955 F.3d 1339, 1344 (Fed.

Cir. 2020) (quoting *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002)).

Because it is beyond dispute that Plaintiff-Awardees are actual bidders, the dispute focuses on the second prong of the "interested party" definition—whether Plaintiff-Awardees' "direct economic interest" would be affected by the Government's failure to award the contract. *See* Telos MTD at 6 (focusing on the "direct economic interest" prong); Red River MTD at 3 (same). What constitutes a sufficient "direct economic interest" for standing is dependent upon the procedural posture of the protest at hand. *Sys. Application & Techs., Inc.*, 691 F.3d at 1382 ("A protest will, by its nature, dictate the necessary factors for a 'direct economic interest.'") (citation omitted). To satisfy the "direct economic interest" element, plaintiffs in post-award protests must show they had a "substantial chance" of receiving the contract award. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("To establish prejudice, [plaintiff] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process.") (citation omitted). Here, Plaintiff-Awardees have alleged that but for the Government's challenged errors in evaluating theirs or other proposals, they would have a substantial chance of award. The Defendant-Intervenors do not challenge any of this. Instead they argue that the Plaintiff-Awardees automatically lack standing because they are members of CTA Teams that won BPA awards. These arguments are not convincing.

First, the notion that awardees can never have bid protest standing has been soundly rejected by this Court. As the Court held in *National Air Cargo Group, Inc. v. United States*, 126 Fed. Cl. 281, 295 (2016), "status as a contract awardee does not by itself deprive this court of bid protest jurisdiction." As another member of this Court recently explained, "an awardee still has an 'economic interest' in 'stopping the government from stepping outside stated procurement terms in making further awards." *PAE-Parson Global Logistics Services, LLC v. United States*, 145 Fed. Cl. 194, 199 (2019) (quoting *Nat'l Air Cargo Grp.*, 126 Fed. Cl. at 295); *see also Fluor Intercontinental, Inc. v. United States*, 147 Fed. Cl. 309, 323-24 (2020) (finding standing when awardees challenged awards of "more valuable IDIQ contracts to other offerors").

Second, the motions to dismiss rely upon cases that hold the Court lacks protest jurisdiction over cases challenging the plaintiff's own contract award. Indeed many of these cases addressed pre-award protests that challenged the terms of the procurement and held that the plaintiff loses standing to maintain such a challenge upon award. *See* Telos MTD at 6 (collecting cases). But these cases do not support the argument here that Plaintiff-Awardees lack standing to challenge the Government's rejection of their quotes simply because they are members of CTA Teams led by others that won awards. For example, *MLS-Multinational Logistic Services, Ltd v. United States*, 143 Fed. Cl. 341 (2019), is a case in which a contract awardee sought to change the terms of its existing contract through the protest process. Because MLS did not allege any fault in the Government's award decision, the court determined that the protest was "more consistent with a pre-award protest seeking to change the terms of the solicitation" and that an awardee performing under a contract did not have standing to bring a pre-award protest. *Id*. at 370-75. Instead, the court noted that awardees must pursue a Contracts Disputes Act ("CDA") claim to challenge terms within their contract. *Id*. at 376. Here, Plaintiff-Awardees are specifically alleging error in the Government's evaluation and award decisions that

prevented them from obtaining separate awards.  CounterTrade Resp. at 8 ("CounterTrade has alleged violations of procurement law by GSA in making the BPA awards, and it has a substantial chance of receiving a BPA award as a team lead if it is determined that such violations occurred."); Blue Tech Resp. at 7 ("But Blue Tech is not challenging the terms of its own Team Member award. Rather, it is challenging the Agency's failure to award it a BPA as a Team Lead."); Sirius Federal Resp. at 7. ("Sirius Federal is protesting a selection issue; its Complaint is a 'protest' Complaint that 'stem[s] from [its] status as offeror[], not awardee[].'")(internal citations omitted).

It is certainly true that *MLS-Multinational Logistic* "pointed out that 'a number of decisions by judges of the United States Court of Federal Claims' support the proposition that contract awardee's lack standing to bring protests under this court's bid protest jurisdiction and are limited to raising claims under the court's [CDA] jurisdiction." Telos MTD at 6, ECF No. 52 (citing *MLS-Multinational Logistic*, 143 Fed. Cl. 341, 361-66 (2019) (collecting cases)).  But these cases are similarly distinguishable as cases that challenge terms of existing contracts rather than challenging an award decision.  *See TransAtlantic Lines LLC v. United States*, 126 Fed. Cl. 756 (2016) (rejecting protest standing for claim that the Government's refusal to accept proposed rates after the contract award was a violation of the Cargo Preference Act of 1904); *ITility, LLC v. United States*, 124 Fed. Cl. 452 (2015) (rejecting protest standing when plaintiff challenged a CPARS evaluation of it under a contract it was performing); *Kellogg Brown & Root Services, Inc. v. United States*, 117 Fed. Cl. 764 (2014) (rejecting protest standing for a contract dispute over the close out method for an existing contract that plaintiff had performed on for more than ten years); *Trailboss Enterprises, Inc. v. United States*, 111 Fed. Cl. 338 (2013) (rejecting standing when plaintiff alleged after contract formation that its pricing was no longer valid and sought to enjoin the Airforce from "compelling" it to perform under the contract); *Diversified Maintenance Systems, Inc. v. United States*, 103 Fed. Cl. 431 (2012) (rejecting protest standing in a breach of contract case that plaintiff alleged fell under this Court's jurisdiction because it was "in connection with a procurement"); *Outdoor Venture Corp. v. United States*, 100 Fed. Cl. 146 (2011) (rejecting protest standing when plaintiff was awarded a contract and attempted to protest the threatened termination of that contract for convenience).  But none of the plaintiffs in these cases asserted that a contract was improperly awarded or that a quoter was not awarded a contract when they should have, as Plaintiff-Awardees allege here.  These cases thus stand for the uncontroverted proposition that a contractor may not circumvent the CDA by invoking this Court's protest jurisdiction.  Plaintiff-Awardees are not attempting to do so here; indeed, there is no provision of the CDA that allows a disappointed bidder to challenge the Government's evaluation of its proposal.

Finally, the Defendant-Intervenors argue that Plaintiff-Awardees cannot qualify as "interested parties" because they have already received BPA awards as CTA Team Members. Telos MTD at 7; Red River MTD at 3.  Telos additionally maintains that "to the extent that Plaintiff-Awardees are affected by the Agency's decision not to provide them with additional awards, the impact is too speculative to constitute a direct economic interest."  Telos MTD at 7. Red River furthers this point by asserting, "[n]one [of the Plaintiff-Awardees] has a substantial chance of becoming any more of an awardee than it already is."  Red River MTD at 3.  This argument rings hollow.  Both Defendant-Intervenors moved to intervene in this case under RCFC 24(a).  According to Telos, it "invested substantial time and money in the preparation of

its proposal that led to the award protested in this action and, by intervening, Telos will be able to protect its investment." ECF No. 11 at 2. Similarly, "Red River seeks to intervene to protect its interest in the Blanket Purchase Agreement ('BPA') awarded to Red River by the General Services Administration ('GSA') . . . ." ECF No. 14 at 1. These arguments certainly appear to be based on the awards to the Defendant-Intervenors as team leads rather than the award made to [ … ], the lead of a team that both Defendant-Intervenors are members of. It is thus hard to accept that Defendant-Intervenors can have a sufficient interest in defending their award as a team lead while arguing that the Plaintiff-Awardees do not.

In any event, there are some significant differences in being awarded a contract as a team lead and as a team member. It bears noting that the Defendant-Intervenors only submitted one quote in response to the RFQ for which they each led teams. And the RFQ provides that "BPA Holders/Team Leads" may add or remove members of their teams, meaning that team members do not appear to have the assurance that they will retain their status as team members on teams that they do not lead. RFQ § 10.13, D. Appx at 163. While the Defendant-Intervenors argue that this provision applies to all team leads and team members, that interpretation fails to account for the fact that changes will be made through a "BPA modification signed by the BPA Contracting Officer." *Id*. Because only the team lead is permitted to communicate with the BPA Contracting Officer after award, RFQ § 10.10, D. Appx at 157, it does not follow that anyone other than the team lead is able to remove other team members under the RFQ's terms. Finally, the Government itself understood that it was making nine awards under the RFQ. *See* D. Appx at 981 (listing the "*nine awardees* and their CTA Team members") (emphasis added).

Because Plaintiff-Awardees meet the "substantial chance" standard constituting a "direct economic interest," they have standing to pursue their protests.

## IV.   Plaintiffs' Motions for Preliminary Injunctive Relief.

"[A] party is entitled to a preliminary injunction if: (1) the party has a likelihood of success on the merits; (2) the party will be irreparably harmed without injunctive relief; (3) the balance of hardships favors the petitioning party; and (4) the public interest favors the grant of injunctive relief." *Akal Security, Inc. v. United States*, 87 Fed. Cl. 311, 317 (2009) (citing *Erico Int'l Corp. v. Vutec Corp.*, 516 F.3d 1350, 1353–54 (Fed. Cir. 2008)). "No single factor is determinative, and 'the weakness of the showing regarding one factor may be overborne by the strength of the others.'" *Id*. (quoting *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993)). "Conversely, 'the absence of an adequate showing with regard to any one factor may be sufficient' to deny preliminary injunctive relief." *Cashman Dredging & Marine Contracting Co., LLC v. United States*, 148 Fed. Cl. 58, 63 (2020) (quoting *FMC*, F.3d at 427). "Preliminary injunctive relief is characterized as an extraordinary remedy." *Id*. "Nevertheless, the decision to award such relief is within the discretion of the court." *Id*.

**A.      Neither CDW-G nor CounterTrade has established a likelihood of success on the merits.**

The first factor in deciding whether to grant preliminary injunctive relief concerns the plaintiff's likelihood of success on the merits.  "'[W]hen analyzing the likelihood of success factor, the trial court, after considering all the evidence available at this early stage of the litigation, must determine whether it is more likely than not that the challenger will be able to prove at trial' the validity of its claim."  *Eskridge Rsch. Corp. v. United States*, 92 Fed. Cl. 88, 97 (2010) (quoting *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1379 (Fed. Cir. 2009)).  In bid protest actions, a plaintiff's success on the merits turns on whether the Court finds that the procurement decision in dispute was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Akal Sec.*, 87 Fed. Cl. at 315 (citing 5 U.S.C. § 706(2)(A)).

1.      <u>CDW-G does not establish a likelihood of success.</u>

CDW-G makes three arguments regarding its likelihood of success on the merits.  First, CDW-G contends that the Government "arbitrarily and capriciously evaluated the offerors' quotes under the BOEM Factor by failing to hold offerors to the strict requirements for the supporting documentation required under this factor."  CDW-G Mot. at 7.  Second, CDW-G asserts that the Government arbitrarily and capriciously evaluated the offerors' submissions under the Price Factor by improperly allowing end-of-life and/or products that failed to meet minimum salient characteristics.  *Id*. at 9.  Third, CDW-G argues that the Government improperly conducted the best-value tradeoff as required by the RFQ and "instead mechanically tallied offerors' scores to select BPA awardees."  *Id*. at 9-10.  Each argument will be addressed in turn.

a)      *CDW-G is unlikely to succeed in arguing that the Government improperly evaluated offerors' submissions under the BOEM Factor.*

CDW-G asserts that the Government must have arbitrarily and capriciously failed to adhere to the documentation requirements added to the RFQ in Amendments 18 & 19.  *Id*. at 7.  According to CDW-G, the only way to meaningfully increase a quoter's BOEM score was to add new OEMs to a quote and provide the additional documentation.  CDW-G Mot. at 7.  Because offerors only had 15 business days from August 10, 2020 to August 31, 2020 to provide brand new OEM documentation required by Amendments 18 & 19, CDW-G concludes that "[i]t is simply improbable that any offerors could have materially increased their scores" for the BOEM Factor.  *Id*. at 7-8.

But CDW-G's premise is flawed.  First, quoters had two months' notice of the additional documentation requirements.  As the Government explains, a draft of Amendment 18 that included the additional documentation requirements was sent to quoters on July 1, 2020.  Def. Resp. at 12-13 (citing D. Appx at 131-32).  When the Government sent a second draft of Amendment 18 to quoters on July 23, 2020, the Government advised quoters "use this time before quotes are officially due in response to the official Amendment 0018 to solidify any changes necessary to their Schedule contracts, fix any Letter of Supply issues, obtain new pricing as necessary, [and] begin completing Attachment B – Breadth of OEMS – AMD 18 that is

attached to this email." *Id*. at 13 (citing D. Appx at 134).  CDW-G appears to concede this point in its Reply but insists that the lack of documentation confirming that all BOEM documentation is valid means that the Government ignored the requirement.  CDW-G Reply at 6-7.  This turns the analysis on its head because the Court assumes the Government acted in compliance with the law unless shown otherwise.  *E.g., Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001) ("[I]n determining whether to require an explanation, the agency decision is entitled to a presumption of regularity.  Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious.  The litigant challenging that presumption necessarily bears a heavy burden.") (internal citations omitted).

Second, the Government points out that there was not a 15-day, or even a two-month, period in which quoters were able to establish relationships with new OEMs.  The CTA Teams submitted their quotes for the second round of evaluation on May 6, 2019.  Def. Resp. at 12 (citing CDW-G Compl. ¶¶ 14, 19 & D. Appx at 44-46).  Thus, CTA Teams had from May 6, 2019 until August 31, 2020 to establish new relationships and add OEMs to their proposal.  CDW-G fails to explain why this was insufficient time to establish new OEM relationships.

Finally, and most importantly, CTA Teams could also add OEM coverage to their quotes by [ … ], which would increase their BOEM scores.  Def. Resp. at 13 (comparing D. Appx at 48-49 with 886-87).  Indeed, this is what several CTA Teams did, including the Defendant-Intervenors.  *Id*.  CDW-G's only response to these facts is by taking issue with the possibility that [ … ] could increase the score, noting that six offerors [ … ] and their BOEM Factor scores decreased.  CDW-G's Reply at 7.  This does nothing to change the fact that awardees did increase their scores through [ … ].

Accordingly, the Court finds that CWD-G has not shown that it is likely to succeed on the merits on the theory that the Government arbitrarily and capriciously disregarded the requirements of the RFQ relating to the BOEM Factor.

> *b)*    *CDW-G is unlikely to succeed in arguing that the government arbitrarily and capriciously evaluated the offerors' submissions under the price factor.*

CDW-G's next argues (in a total of two paragraphs) that the Government must have disregarded the RFQ's requirements "because the average price of awardees is unrealistic as compared to the requirements."  CDW-G Mot. at 9.  According to CDW-G, the only way that awardees could quote such low prices was to bid "prohibited end-of-life or discontinued products or for products that do not meet the minimum specifications required by the RFQ."  CDW-G Mot. at 9.  Here too, CDW-G argues that the Government failed to document how it assessed quotes to determine if prohibited end-of-life products were included.  In CDW-G's terms,

> the [Defendant's] Appendix wholly fails to describe how the
> Government conducted its end-of-life and discontinued product
> analysis. There is simply no articulated process for assessing end
> of life, such as whether the Government researched each part

number, consulted the Letters of Supply, reviewed technical documentation in light of requirements, etc. There is no support for, and the Government has not cited to anything purporting to be, the process by which it conducted its end-of-life and discontinued product analysis.

CDW-G Reply at 8-9.

CDW-G's argument fails.  The RFQ provides that "Quoters shall not quote products that are end of life.  The decision as to whether the Quoter's quoted product is an end of life item rests solely with the procurement evaluation team." D. Appx at 190.  While CDW-G argues that there is no explanation of how the Government conducted this analysis, the Government's Appendix does make clear that the GSA did conduct this analysis.  In fact, when GSA found an end of life product, GSA identified it and brought it to the attention of the quoter.  When evaluating one of the quotes, GSA determined that "[w]hile the quoted item itself meets the minimum salient characteristics, the item quoted is discontinued/end of life." D. Appx at 726.  Upon identifying this end of life product, the GSA brought it to the quoter's attention, and a different product was substituted in that quoters final quote.  *Id*. at 727.  Based on the record before the Court, it does not appear that the GSA's consideration of the end of life issue was arbitrary or capricious simply because the GSA did not specifically state that each product was not an end of life product.

> c) *CDW-G is unlikely to succeed in arguing that the government failed to conduct the best-value tradeoff as contemplated in the RFQ.*

CDW-G's final argument is that the Government failed to conduct a best-value tradeoff as required under the RFQ because the Government "improperly applied a mechanically rote exercise aimed only at reviewing the overall evaluated scores of offerors to determine the list of awardees, without actually conducting the tradeoff of price and non-price factors it was required to perform." CDW-G Mot. at 10.  While CDW-G acknowledges that the Government discussed the merits of the awardees at the various phases of the best-value tradeoff, it purportedly "wholly failed to consider the merits of CDW-G's proposal and instead irrationally relied solely on the mechanical application of point values." CDW-G's Reply at 11.  While CDW-G clearly believes a more detailed analysis should have been documented, that is not the issue for the Court to decide.  The issue for the Court is whether what the GSA did was rational.  It was.

Before turning to the merits of CDW-G's argument, the Federal Circuit's precedent makes clear that this Court is to provide the deference to the Agency's best value tradeoff. *E.g., Med. Dev. Int'l, Inc. v. United States*, 89 Fed. Cl. 691, 702 (2009) ("A court reviewing a best value procurement agency action must be highly deferential, and the agency that made the determination in question is presumed to have acted in a reasonable and rational manner.") (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (additional citation omitted); *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("Additionally, as the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone.") (citation omitted).

As explained above, the best value trade off, which spans thirty pages of the decision document, proceeded in six phases.  In the first phase, the Agency identified the four quoters that were rated in the top nine for their technical scores and were within the nine lowest-priced quotes.  D. Appx at 952-56.  Given that the Agency was planning for nine awards, this combination would appear to rationally identify the candidates likely to be the most beneficial quotes for the Government.  CDW-G argues that the analysis was flawed, however, because the decision refers to the unsuccessful quoters in the collective, without mention of CDW-G specifically.  CDW-G Reply at 12-14 (citing Revised Award Decision Document, Tradeoff Analysis Process Explained, D. Appx at 952 ("Red River is number three in price as compared to sixteen quoters in this tradeoff analysis."); *id*. at 953 ("New Tech is ranked number seven in points and nine in price."); *id*. ("New Tech is number seven in price as compared to sixteen quoters in this tradeoff analysis."); *id*. at 954 ("These four quotes were both the top nine evaluated quotes in terms of price and the top nine in terms of non-price factors proving them to be the best value total solution for the Government.")).  Given that each of the four potential awardees from Phase I—Red River Technology, LLC, New Tech Solutions, World Wide Technology, LLC, and Govplace, Inc.—was higher rated technically and lower priced than CDW-G, it is hard to imagine what trade off was necessary here.  In any event, the GSA explained what made these proposals technically superior.  For example, regarding Red River, the Government states:

> One of the key components in Red River['s]s quote is their vast breadth of OEMs coverage for the 275 "named OEMs" in the Breadth of OEMs self scoring assessment. Red River can cover [ … ] of 21 of the mandatory OEMs listed in RFQ section 15.1(a) and 15.2.7 of the RFQ. Of the top tier OEMs (Tier 1, Tier 2, Tier 3, Tier 4, Tier 5, and Tier 7 OEMs having points values of 150 or more) listed within the Attachment B – Breadth of OEMs Self Scoring Assessment, Red River has the ability to supply [ … ] out of 50 of those OEMs products.

D. Appx at 952; *see also* D. Appx. 953 (similarly discussing the OEM coverage of the other phase one awardees).

CDW-G fails to identify anything that requires the Government to specifically compare each proposal to each other when proposals being considered are both higher rated technically and lower priced than CDW-G's.  Indeed, "[i]t is well settled that the government is only required to make a 'cost/technical tradeoff . . . where one proposal is rated higher technically than another, but the other is lower in cost.'"  *Indus. Property Mgmt., Inc. v. United States*, 59 Fed. Cl. 318, 324 (2004) (quoting *State Mgmt. Servs., Inc*., B-255,528 Comp. Gen., 1995 WL 19600 at *5) (additional citations omitted) (alteration in original).

CWD-G next argues that the remaining five rounds of trade off suffered from the same flaw.  CDW-G Reply at 12.  As an example, CDW-G attacks the GSA's decision to award a BPA to DH Technologies, which is higher rated technically but slightly more expensive than CDW-G.  *See* D. Appx at 961.  CDW-G quotes the Government's conclusion and points to all the references to technical scores:

In summary, despite ***identical scores*** for the socioeconomic factor for all quoters in this tradeoff analysis and a ***slightly lower relevant experience score*** than PCMG, Telos, M2 Technology, CDW Government, FCN, Connection (GovConnection), and Iron Bow, there was a ***vast difference in the Breadth of OEMs score*** for DH Technologies quote as compared to the remaining quoters in this tradeoff analysis. DH Technologies has a vast Breadth of OEMs coverage with a total of 267 Letters of Supply. These differences in DH Technologies' quote as compared to the remaining quoters was significant to the agency particularly their Breadth of products ***as the Breadth of OEMs Factor accounts for 87% of all points based non-price factor points available***. DH Technologies lowered their initial BPA price by 51.22% from $329,434.75 to 160,692.67. Despite their $160,692.67 BPA price making them the ***11th lowest quote of the twelve quotes*** in this tradeoff decision ***(or 16th lowest price quote out of all quoters)***, DH Technologies quote provides better value to the Government relative to the overall objective of the acquisition.

*Id*. at 12-13 (quoting D. Appx at 963-64) (emphasis added in CDW-G Reply).

Relatedly, CDW-G further underscores that, after indicating above that DH Technologies received a higher BOEM Factor score, "[i]nstead of discussing how the DH Technologies' BOEM scope was of greater benefit to the Government than other offerors' BOEM scopes, the Government focused solely on the fact that DH Technologies had a higher BOEM score:"

DH Technologies ***has greater technical merit*** for the non-price factors than the other ten quoters (PCMG, Telos, Force 3, M2 Technology, CDW Government, FCN, Connection (Gov Connection), MicroTechnologies, Iron Bow, Integration Technologies Group) in this tradeoff analysis. DH technologies ***vast breadth of products*** aligns with the fundamental scope of the 2GIT acquisition. Their ***Breadth of products*** combined with their relative experience merits its higher price. There is a greater benefit to the Government to make an award to DH Technologies at a higher price as DH Technologies quote demonstrates qualities important to GSA and its customers regarding ***breadth of original equipment manufacturers***, relevant experience [which was lower than other offerors, including CDW-G], and socioeconomic makeup [which was identical to all other offerors in this tradeoff analysis]. The Government has determined that there is minimal to no increased risk in awarding to DH technologies at a higher price. DH Technologies' quote did not contain any finding[s] that have not been cured or adequately addressed through confer sessions or points deductions. DH Technologies' quoted price of $160,692.67 was determined fair and reasonable.

*Id*. at 13-14 (quoting D. Appx at 964) (emphasis added in CDW-G Reply).

The Court is unpersuaded by CDW-G's arguments here as well.  While the GSA was certainly free to add even more detail to the 30 pages it spent explaining its best value trade off, that was not required.  Here, the GSA made clear in the RFQ that "The GSA evaluation team *will total the points scoring* for evaluation non-price Factors 1, 2, and 3 for all the Quoters.  The Government will then select the potential awardees based upon an assessment and tradeoffs of non-price factors and price.  *The amount of <u>total points</u> for non-price Factors 1, 2, and 3 will be considered as part of the tradeoff analysis*."  RFQ § 15.2.5.2, D. Appx at 201 (emphasis added).  To the extent CDW-G complains that it is the total points that the GSA considered for the OEM factor rather than a granular analysis of each specific OEM is foreclosed by the RFQ.

Moreover, the RFQ explicitly puts quoters on notice that the Breadth of OEM would be the most significant technical factor for award.  First, the Government explained that "[a]ll evaluation factors other than cost or price, when combined, are significantly more important than cost or price."  RFQ § 15.1(a), D. Appx at 187.  Second, the Government made clear that the most important non-price factor is the Breadth of OEMs Factor, stating:

> In addition to the Breadth of OEMs Factor making up 87% of the total possible points available for all points-based non-price factors, as the quotes became more equal with regard to the Relevant Experience and Socioeconomic Factors, the more controlling the Breadth of OEMs Factor became in the tradeoff determination. *For this reason, most of the emphasis in the below tradeoff analysis will be placed on Breadth of Original Equipment Manufacturers as well as price*.

D. Appx at 950 (emphasis added).  When viewed under these criteria, the GSA's explanation of why DH Technologies' quote was more beneficial to the Government than CDW-G's is sufficient.  DH Technologies offered the broadest OEM coverage, which the GSA found to be "a vast difference" between its proposal and the others.  D. Appx at 963.  Finally, it is important that the price difference was minimal here – CDW-G's evaluated price was [ … ], while DH Technologies' evaluated price was [ … ].  D. Appx at 961.  Given the greater significance of the non-price factors, it was rational for the GSA to find that the "vast difference" in DH Technologies' technical quote justified the small increase in evaluated price.  While CDW-G does not address the remaining trade off decisions, they are similarly documented.  *See* D. Appx at 959-60 (explaining that Sterling Computers' proposal was superior on technical factors, particularly breadth of OEM, and only slightly higher priced at $161,215.07); D. Appx at 967 (explaining that PCMG's greater breadth of OEM offerings justified the slightly higher price of $160,012.31); D. Appx at 970-71 (explaining that Telos's higher rated proposal and lower price justified award); D. Appx at 973-74 (explaining that M2's slightly higher rated and less expensive proposal was more beneficial to the Government).

> d)      *The Court will not consider CDW-G's argument raised for the first time in its reply that the record does not indicate a required comparative analysis*.

Finally, CDW-G introduces a new argument in its Reply that there is no record of the Government's "comparative analysis of each item quoted in the market basket" as required under the RFQ.  CDW-G Reply at 9-10.  "Raising [an] issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration." *Eden Isle Marina, Inc. v. United States*, 89 Fed. Cl. 480, 507 n.25 (2009) (quoting *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)) (emphasis in original); *see also* RCFC 5.4(a)(2)(E) (requiring the "*first brief or memorandum*" to contain "a clear statement of the argument, setting forth the points of fact and law being presented and the authorities relied upon") (emphasis added).  This Court, like other courts, considers any argument raised for the first time in a reply brief to be waived.  *E.g., 2M Research Servs., LLC v. United States*, 148 Fed. Cl. 99, 110 (2020) ("Arguments raised for the first time in a reply brief are not properly before this court.") (quoting *United States v. Ford Motor Co*., 463 F.3d 1267, 1276 (Fed. Cir. 2006)); *Tetra Tech Amt v. United States*, 128 Fed. Cl. 169, 184 (2016) ("[I]t is 'well established that arguments not raised in the opening brief are waived.'") (quoting *SmithKline Beecham Corp. v. Apotex Corp*., 439 F.3d 1312, 1319 (Fed. Cir. 2006)) (additional citations omitted).

While it is true that CDW-G did not have access to the Agency's decision document until the Government filed its Response to the preliminary injunction motions, CDW-G's argument is based on the presumption that the *Administrative Record* is devoid of any documentation of the Agency's analysis, which is unsupportable at this stage.  What we do know at this stage is that the evaluation team:

1.   "[C]onducted an independent *analysis of the individual items* quoted by each quoter to determine if the prices quoted for each item was at or below their schedule prices";

2.   "[C]onducted a price *analysis and made a determination as to whether each item quoted was determined fair and reasonable* (independent of prices quoted by other quoters)";

3.   "[C]onducted a [sic] analysis to determine whether discounts in each Quoters Attachment E - Market Basket - AMD 18 mirror the discounts quoted in Attachment F - Discount Rates - AMD 18"; and

4.    "In accordance with RFQ section 15.2.1.1.2, the evaluation team also utilized other tools (i.e. standard deviation calculations, GSA's Price Point PLUS Portal (4P Tool), which is a GSA developed market research tool that provides multiple data points to assist GSA contracting staff in determining whether fair and reasonable pricing has been obtained, etc.) in determining price reasonableness."

D. Appx at 922 (emphasis added).  This recitation makes clear that an analysis of each item was performed.  Once we have the *Administrative Record*, CDW-G may argue whether the record sufficiently documents such analyses in its motion for judgment on the administrative record and for permanent injunctive relief.

2.       CounterTrade does not establish a likelihood of success on the merits.

CounterTrade's protest rests largely upon a dispute over what the RFQ required quoters to propose as an Advanced Secure Web Gateway ("Gateway"). The Gateway, which is a mandatory component for the price evaluation, is a computer network security device that "controls web traffic" by processing all the data coming into and going out of a computer network. CounterTrade Mot. at 16. As part of this processing, the Gateway "filter[s], strip[s], block[s] or replace[s] web content to mitigate risks and prevent data loss." *Id.* Much of CounterTrade's protest depends on whether quoters were permitted to include a "cold spare" version of the Gateway that is only functional as a backup unit. While there is some dispute as to what specific differences exist between the "cold spare" and primary devices, it is not disputed that the cold spares lack any licenses and "are utilized as backup units." D. Appx at 116 (discussing different versions of the ASG-S400-30 Gateway).

The central question, therefore, is what the minimum characteristics were for the Gateway under the RFQ. If CounterTrade is correct that only the more expensive version of the Gateway meets the RFQ's minimum requirements, then GSA erred in awarding BPAs to quoters offering the cold standby devices. *See, e.g., Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1038 (Fed. Cir. 2009) ("[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.'") (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996)) (alteration in original). Under the RFQ, the minimum salient requirements for the Gateway are:

> ***DEVICE ONLY***
> Physical: Disk Drives= capable of supporting 6TB SAS; Boot Device= capable of supporting 16GB SSD (redundant); RAM= capable of supporting 32GB; Onboard Ports= capable of supporting (2) 10/100/1000Base-T capable w/bypass, (2) 10/100/1000Base-T (non-bypass); 10/100/1000Base-T, BMC Management Port Optional NICs= capable of supporting 1GbE Fiber, 10Gb Base-T, or 10Gb Fiber; Chassis= 1 RU
> Available slots= 1 Full height/1 half height; (2) Power supplies= min 350W, redundant, hot swappable
> Integrated Threat Protection

D. Appx at 250. CounterTrade makes several arguments that the RFQ requires the licensed version of the Gateway.

First, CounterTrade argues that the cold standby device is merely a "backup component for the specified Advanced Secure Web Gateway Device." CounterTrade Mot. at 16; *see also* D. Appx at 116 (recognizing that cold standby machines are "not functional without configuration"). And as a backup component, according to CounterTrade, the cold standby cannot be purchased without the primary gateway device and is typically only permitted for use by OEMs and system licenses when the primary device is not functioning. *Id.* at 16-17. Thus, the price listed for the cold standby is not an accurate reflection of the cost of purchasing a functioning device. True enough. But that is only a problem if the GSA were seeking a functional configuration through the price evaluation. It was not. The purpose of the price comparison was to compare prices for a sampling of devices. According to the RFQ: "A market basket evaluation approach will be utilized in evaluating price for this acquisition. The market basket includes a sample of products most frequently purchased based on historical data." RFQ § 15.2.1, D. Appx at 190.

17

Second, CounterTrade argues that the minimum salient characteristics require the necessary software for the Gateway to have "Integrated Threat Protection" as required by the RFQ. This, according to CounterTrade, "requires that the device be functional and have software to detect and isolate threats. A cold standby does not satisfy this requirement." CounterTrade Reply at 4. The Government, however, argues that "[t]he only difference between the 'cold standby' parts and the part that CounterTrade proposed is that licenses are pre-installed onto the version that CounterTrade proposed but have yet to be installed onto the cold standby devices." Def.'s Resp. at 19-20. Both CounterTrade and the Government rely solely on statements appearing on the same page of the GSA's evaluation.

According to CounterTrade, when the GSA recognized that the cold standby "is not functional without configuration," D. Appx at 116, that necessarily means that it does not have any software installed on it at all. CounterTrade Reply at 10. The Government, however, relies on the same discussion to conclude that "[t]he only difference between the 'cold standby' parts and the part that CounterTrade proposed is that licenses are pre-installed onto the version that CounterTrade proposed but have yet to be installed onto the cold standby devices." Def.'s Resp. at 19-20 (citing D. Appx at 116). But there is nothing about the GSA's recognition that the cold standby is not functional without configuration that compels the conclusion that there is no software at all installed on the device. Instead, it could just as easily mean that the device will not work until licenses are installed, as the Government asserts. Indeed, as the Government points out, the RFQ specifically states that quote is for the "***DEVICE ONLY***." The Government added "device only" to the RFQ in Amendment 18 because quoters were offering a wide variety of Gateways ranging from cold standby to versions licensed for many users and the GSA wanted to clarify what it was seeking. Def. Resp. at 21-22. There is nothing irrational about the GSA's determination that the cold standby satisfied the RFQ's requirements.

Third, CounterTrade argues that quoters could not have complied with requirements to provide documentation showing that a cold standby satisfied all the RFQ's minimum salient characteristics. CounterTrade Mot. at 17. CounterTrade observes that all "[q]uoters were obligated to include sufficient supporting detail to evidence that the specific part they proposed satisfied the RFQ's minimum salient characteristics." *Id*. As such, CounterTrade maintains that the "awardees simply could not have provided the requisite supporting documentation to confirm that the part number they proposed (which has a "CS" at the end designating the device as only a "cold standby") actually complies with the RFQ requirements." *Id*. And that the Government did not provide the specification sheets in its Appendix with the cold standby part number confirms that none were submitted. CounterTrade Reply at 9-10. Therefore, according to CounterTrade, "the awardees' failure to provide the required documentation to demonstrate that their cold standby units met all RFQ requirements . . . render[s] the award decision as improper and unlawful." *Id*. at 10.

The Court is not persuaded. Because, as explained above, the cold standby appears to satisfy all RFQ minimum requirements, there is no reason to conclude that documentation of a cold standby Gateway was insufficient to show that it met all RFQ requirements. Moreover, to the extent CounterTrade argues that the lack of any documentation in the Government's Appendix establishes that no quoter included such documentation presumes that the *Administrative Record* lacks any such documentation, which is not supportable at this time.

Finally, CounterTrade points to the consideration of Blue Tech's quote as showing that the GSA failed to consider the specific part numbers being offered and "only looked at the characteristics of the broader model series (SG S400-20), as opposed to the characteristics of the part number actually proposed (SG-S400-20-SRP)." CounterTrade Reply at 11. But, as CounterTrade recognizes, the GSA rejected Blue Tech's quote. With regard to other quotes, the GSA clearly recognized the specific part numbers offered. *See, e.g.*, D. Appx at 706 (recognizing the changed Gateway part number in an accepted proposal). There is no indication in the limited record before the Court that the GSA improperly reviewed documentation in proposals it did not reject. Finally, the Court is not able to determine at this stage whether Blue Tech's documentation is sufficient, particularly considering Blue Tech's arguments that the RFQ only requires a device that is "capable of supporting" certain size hard drives and memory. *See* Blue Tech Compl. ¶¶ 21, 48.

Because neither movant has shown a likelihood of success on the merits, this factor weighs against granting injunctive relief.

### B.   CDW-G and CounterTrade establish irreparable harm.

To obtain injunctive relief, CDW-G and CounterTrade must show that they would not "have an adequate remedy at law absent an injunction." *Std. Commc'ns, Inc. v. United States*, 101 Fed. Cl. 723, 744 (2011) (citation omitted). Here, CDW-G and CounterTrade claim irreparable harm in the form of lost profits from work that they will not be able to compete for. CDW-G Mot. at 11-12; CDW-G Reply at 15-18; CounterTrade Mot. at 19-21; CounterTrade Reply at 12-13. Here it appears that the Government is waiting to issue numerous orders against the BPAs and intends to do so without limitation during the pendency of this litigation (likely through mid-June). *See* Contracting Officer's Decl. ¶ 9, ECF No. 53-3 (stating that the "Air Force and federal agency customers have delayed millions in infrastructure investments awaiting the 2GIT BPA awards.").

To the extent that CDW-G and/or CounterTrade prevail at the end of the case, there is nothing the Court can do to remedy the lost opportunity to compete for this work and the lost profits associated with their lost opportunity. Indeed, there is no adequate remedy for this harm available at law because the only monetary relief the Court could award is bid preparation costs. *E.g.*, 28 U.S.C. § 1491(b)(2) ("To afford relief in such an action, the courts may award any relief that the court considers proper . . . except that any monetary relief shall be limited to bid preparation and proposal costs."); *see also Bean Dredging Corp. v. United States*, 22 Cl. Ct. 519, 524 (1991) (finding irreparable harm "because plaintiffs could recover only bid preparation costs, not lost profits, through an action at law").

Therefore, this factor weighs in favor of granting injunctive relief.

### C.   The balance of the harms weighs against injunctive relief.

The third factor in determining whether to grant a preliminary injunction is that the balance of hardships favors the petitioning party, *i.e.* the plaintiff's hardship outweighs the hardship to the Government and to third parties. *E.g., Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 320 (2009). In considering this factor, the Court must "give due regard to the interests

19

of national defense and national security." 28 U.S.C. § 1491(b)(3). Where national security issues are implicated, "the fact that a delay in the conduct of this procurement would raise national defense concerns clearly places the weight of the balance-of-harms factor on defendant's side of the scale." *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 241-42 (1997).

Here, the Government relies on the Contracting Officer's declaration, which sets forth several national security concerns regarding delays in the 2GIT awards. Def's Resp. at 25-27; *id*. Ex. 1 ("C.O. Declaration") (ECF No. 53-3). The harm to the Government from a preliminary injunction is that "[p]recluding ordering under the 2GIT BPA will erode the Air Force, and other Federal Agencies, FY21 Information Technology implementation of crucial supply chain risk management controls and modernization strategy objectives to specifically address counterfeit and malicious software threats in the commercial Information Technology supplier base [and] . . . hamper government agencies from procuring products that will decrease the risk of compromise and exploitation by threat actors to federal agencies." *Id*. ¶ 5.

As CDW-G and CounterTrade correctly note, however, every device and service offered through the 2GIT quotes are already available to the Government. Since November 2019, the Government has been able to obtain every device and service available under 2GIT through other contract vehicles. *See, e.g.*, CounterTrade Mot. at 22 (explaining that "government agencies can continue to obtain the exact same products and services from numerous other GWACs, or from individual orders/competitions through the GSA Schedule 70 contracts, *i.e.*, purchasing through "eBuy" or "GSA Advantage"). While this may be true, it does not fully obviate the national security concerns here. As a GAO report titled "Federal Agencies Need to Take Urgent Action to Manage Supply Chain Risks," Rep. No. GAO-21-171, found that many agencies failed to implement foundational practices for managing supply chain risks. This RFQ is intended to address many of the GAO's major findings and provides "[t]he only known approved Secure Supply Chain Risk Management (SCRM) mandated vehicle for the Air Force to use to procure all Air Force Network-related Information Technology products . . . ." C. O. Declaration ¶ 4. While other contracts also have some form of supply chain risk management, *see* CounterTrade Reply at 15, the Court cannot say that those vehicles provide the same level of security for the Government. Indeed, the Contracting Officer does point to this procurement as "the only known available procurement vehicle providing verification of SCRM compliant IT products for federal agencies." C.O. Declaration ¶ 13.

The relative harm to CDW-G and CounterTrade—the potential lost profit on work awarded during the short period of this litigation—does not outweigh the security risk to the Government. Therefore, this factor weighs against awarding injunctive relief.

**D.      The Public Interest Weighs Against Injunctive Relief.**

The fourth and final factor in determining whether to grant a preliminary injunction is whether the public interest favors such relief. "There is no dispute that 'the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid.'" *Torres Advanced Enter. Sols., LLC v. United States*, 133 Fed. Cl. 496, 534, *redacted opinion issued*, 135 Fed. Cl. 1 (2017) (citation omitted). "However 'there is a countervailing public interest in minimizing disruption [to the agency].'" *Akal Sec., Inc.,* 87 Fed. Cl. at 321 (quoting *Heritage of Am., LLC*, 77 Fed. Cl.

66, 78 (2007)); *see also Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 242 (1997) ("[A] procuring agency should be able to conduct procurements without excessive judicial infringement upon the agency's discretion.").  Given that CDW-G and CounterTrade are unlikely to succeed on the merits of their protests, as explained above, coupled with the national security interests expressed by the Government, the Court finds that the public interest does not favor granting them a preliminary injunctive relief.  As such, this fourth factor weighs in favor of the Government.

The Court has evaluated the requisite four factors in determining whether to grant a preliminary injunction.  In the end, although CDW-G and CounterTrade will likely suffer some degree of irreparable harm regarding work awarded during the litigation that they may not compete for, that one factor does not overcome the remaining factors in this case.  The lack of likelihood of success coupled with the national security interests articulated by the Government weigh heavily against granting injunctive relief.

## Conclusion

For the foregoing reasons:

1.  Defendant-Intervenor Telos Corporation's Motion to Dismiss, ECF No. 52, is **DENIED**;

2.  Defendant-Intervenor Red River Technology, LLC's Motion to Dismiss, ECF No. 55, is **DENIED**;

3.  Plaintiff CDW Government LLC's Motion for Preliminary Injunctive Relief, Case No. 21-1041 ECF No. 5, is **DENIED**; and

4.  Plaintiff CounterTrade Products, Inc.'s Motion for Preliminary Injunctive Relief, ECF Nos. 39 & 40, is **DENIED**.

**IT IS SO ORDERED**.

s/ Edward H. Meyers
Edward H. Meyers
Judge